38 C.C.P.A.(Patents)
**Application of GREIDER et al.**

**Patent Appeals No. 5745.**

United States Court of Customs
and Patent Appeals.
Jan. 16, 1951.

O'Connell, Judge, dissented in part.

Kenyon & Kenyon, New York City (Lee B. Kemon, Washington, D. C., and Richard K. Parsell, New York City, of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

JACKSON, Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting 11 claims, 1 to 7, inclusive, and 15 to 18, inclusive, of a patent application, serial No. 570,477, filed November 29, 1944. All of the involved claims, with the exception of claims 17 and 18, were rejected by the examiner as unpatentable over the patent to Kennedy, No. 1,820,538, dated August 25, 1931, upon an application, serial No. 282,506, filed June 2, 1928.

Claims 17 and 18 were rejected as not readable on the elected species, there being no allowable generic claim present. Those claims, therefore, are not before us on their merits.

Claim 15 was further rejected on the ground that it is of the Markush type and that there was no reason to warrant allowance of both generic and that type of claim in the same application.

No claims were allowed.

Claims 1 and 4 are illustrative of the subject matter of the application and read as follows:

"1. As an article of manufacture a flexible coherent bibulous felted-fiber sheet-like body, said fibers comprising asbestos fibers which are interbonded *in situ* by the interaction of said asbestos fibers *in situ* as disposed in felted relation in said sheet-like body with a water-soluble inorganic compound which produces a sulphate anion in water solution."

"4. As an article of manufacture a flexible bibulous felted-fiber asbestos paper wherein asbestos fibers constitute the major

proportion by weight of the fiber plus any filler contained in said paper, said asbestos fibers being interbonded *in situ* by the interaction of said asbestos fillers *in situ* as disposed in felted relation in said felted-fiber asbestos paper with a water-soluble inorganic compound which produces a sulphate anion in water solution to provide a tensile strength of at least '5 pounds per linear inch of width for the said flexible and bibulous asbestos paper which for sheet thicknesses up to 0.05 inch is bendable 180° around a 1.5 inch diameter mandrel in 2 seconds at 77° F. without rupture or breaking at the surface."

Claim 2 relates to an article as defined in claim 1 and additionally sets out that the sheet-like body contains less than 2% by weight of organic binder.

Claim 3 is similar to claim 1 with the additional limitation that the sheet contains a major proportion by weight of asbestos fibers and less than 6% by weight of organic material of any kind. The claim further recites that the sheet contains less than 15% by weight of material other than the fiber plus any finely-divided filler contained therein. It is also set out in the claim that the bonded sheet has a tensile strength of at least 5 pounds per linear inch of width.

Claim 5 depends upon claim 4 with the additional recital that any organic fiber plus any organic filler in the paper constitutes less than 10% by weight of the fibers plus any filler contained in the paper.

Claim 6 also depends upon claim 4 but limits the amount of any organic material to less than 6% by weight of such material.

Claim 7 differs from claim 4 merely in that it recites that the asbestos paper is substantially free of organic material.

The application relates to an asbestos paper and a method for producing it. It is stated in the application that invention resides in the making of an asbestos paper in which the asbestos fibers are bonded together without the use of an organic binder and without rendering the product stiff and boardy. The notion of appellants is stated to be the production of asbestos paper sheets and the like which have a high resistance to heat, moisture, rot, and other destructive influences. They state that they have discovered that asbestiform mineral fibers in the form of a felted sheet-like body can be bonded together by the interaction of the said fibers with a solution of a water-soluble inorganic compound which contains a sulphate anion. They claim that a coherent body is then produced which is flexible and porous but with much more strength than an untreated sheet of such fibers. They state that the interaction between the compound and the fiber is not definitely understood but seems to be specific between the fibers and water-soluble inorganic compounds forming a sulphate anion in a water solution.

Appellants illustrate their claimed invention of making a strong and coherent asbestos paper without the use of any organic binder by stating in their application that asbestos fiber of the usual paper grades is made into an aqueous "furnish" pursuant to the conventional methods used in making asbestos paper, and that the "furnish" is made into sheet material on a conventional paper-making machine until an asbestos sheet is formed of the thickness and weight desired. The paper at that stage is free of binder. After it has been formed it is dried and then has a solution of sulphuric acid or the like applied thereto. The degree of dryness before the application of the acid may be merely enough to enable the acid to penetrate into the paper. It is said that preferably the paper is substantially dried, that is, containing less than about 5% by weight of moisture, before the acid is employed. After the application of the acid, the paper is again dried by subjecting it to the action of drying rollers which may be heated to a conventional drying temperature of from 200° to 300° F. It may, however, be dried at ordinary temperature, and it is thereafter ready for use. It is said in the application that the acid is diluted with water from approximately 2% to 25%, but that the concentration of acid employed does not appear to be critical.

Other water-soluble compounds which produce a sulphate anion in solution are disclosed. Those set forth as preferable

are ammonium sulphate, ammonium bisulphate, sodium ammonium sulphate, ammonium aluminum sulphate, ammonium zinc sulphate, lithium sulphate, magnesium acid sulphate, manganese sulphate, potassium sulphate, sodium sulphate, ferric sulphate, ferrous sulphate, potassium bisulphate, and magnesium ammonium sulphate.

It is said that the asbestos sheet material defined in the involved claims is very strong while remaining flexible and bibulous, and that the sheets may be subjected to a sustained temperature of from 900° to 1000° F.

Prior to the discovery by appellants, the fibers of asbestos papers were bound with organic binders such as starch. Because that binder cannot sustain the high temperatures just mentioned, it deteriorates and becomes useless. It is set forth in the application that the advantages of appellants' discovery are available even though some organic material may be present in the product. Where high fire resistance is desired less than 5% by weight of the fiber can be of organic material, and it is also possible to include other mineral fibers such as rock wool, slag wool, glass fibers, and the like, all of which are heat resistant but are more brittle than asbestos fibers.

Regardless as to what minor proportions of organic material may be contained in the sheet, the content of the asbestos fiber must be sufficient for those fibers to come into intimate association so that they become bonded together at a multiplicity of points of contact to create a bond among the asbestos fibers. Therefore, the product should consist in a major proportion by weight of the asbestiform material.

While the usual binder, such as starch, may be omitted entirely, appellants state in their application that it is within the scope of their claimed invention to employ the inorganic compounds with some starch. As an example, they set out that asbestos paper containing 1% or less by weight of starch may be employed without materially detracting from the heat resistance of the paper for the reason that when exposed to high temperatures the paper may be discolored but the bond will be maintained even though the starch has become carbonized.

In addition to the fiber and bonding elements of the product, there may be included a finely-divided filler of the order of 5% to 10% of the weight of the fiber. Among those materials are diatomaceous earth, fine pumice, clay talc, or pigments to impart color.

The Kennedy patent relates to a process of making mineral fiber articles, such as paper and blocks, containing mineral fibers with the aid of sea growths. One of the mineral fibers disclosed is asbestos. It is stated in the specification that prior to the discovery of the patentee, it was impossible by the use of paper-making apparatus to make sheets of 10 mils or less in thickness from raw kelp without incorporating by carding at least 40% by weight of vegetable fiber, such as cotton or flax, in the finished article. Such a quantity of vegetable fiber is said to detract materially from heat resisting and other qualities of the product and it is also a costly operation. The patentee found that he could manufacture in a conventional apparatus a paper from raw kelp which contains substantially no vegetable fiber and the only fiber present being of the mineral class, such as asbestos, mineral wool, or the like. He also states that he may add in his process small proportions of vegetable fibers, such as cotton or flax, but in a lesser amount than 40% by weight of the finished product. It is said that the product made in accordance with the patentee's process possesses nearly all the heat resisting qualities of the mineral fiber and that it has an extremely high electrical insulating value. Sheets made as thin as 1 mil and containing only mineral fibers are even in texture, may be calendared to a high surface finish, possess a high tensile strength and are less absorptive of moisture than when vegetable fibers are present.

In the process of the patent it is set out that 100 pounds of asbestos fiber, preferably of ¼ inch in length or shorter, may be put into a beating machine of the conventional paper-making type with 120 gallons of water and 20 pounds of kelp. To this is added 4 pounds of sodium carbonate. The beater is then operated until the kelp has been dissolved by the alkali combining therewith and becomes completely incor-

porated with the asbestos. At that stage of the process 5 pounds of a precipitant, such as calcium acetate dissolved in 5 gallons of water, is added in order to precipitate the compounds formed by substituting the calcium for the sodium in the kelp compound, and the beating is continued until the materials are in a homogeneous mass. The mass is then removed from the machine and put into the usual type of a Jordan engine and from there into a conventional paper-making machine. It is said in the patent that the kelp which becomes solubilized by combining with the sodium carbonate, forms a colloidal solution of high viscosity, acts as a carrier of the mineral fiber and is fixed in that condition by the precipitant because the precipitated compound is insoluble in water. Therefore, it is said, the product will withstand high temperatures and possess high insulating value. Other suitable material for solubilizing the alginic acid or its compounds in the kelp are set out as sodium hydrate, potassium carbonate, and sodium phosphate. It is further stated that instead of calcium acetate, any other mineral salt which will produce insoluble compounds by reaction with the alginic acid may be used, such as zinc sulphate, aluminum sulphate, or dilute acids, such as sulphuric acid.

The examiner, in his statement, pointed out that in the patent to Kennedy an asbestos paper is disclosed, in the making of which sulphuric acid is employed which contains sulphate anions and held the limitations in the involved claims, that the fibers are interbonded *in situ*, do not avoid the reference for the reason that the sulphate compound of the patent will inherently act as a binder for the fibers. He also held the further limitation in claim 1, that the binder is an interaction product of asbestos and a water-soluble inorganic sulphate, does not render the claim patentable over the reference. He concluded that the same reaction product must be produced in the process of the patent as in the article of appellants.

The Board of Appeals affirmed the decision of the Primary Examiner, but recognized that there is invention in appellants' application by stating as follows:

"In view of the record presented and in the absence of further art, we recommend the allowance of not more than four product claims (generic and three species) directed to the article disclosed together with corresponding process claims. Such claims should be restricted to a flexible, bibulous *paper consisting* essentially of felted asbestos fibers bonded together at their points of contact solely by the product of the action thereon of an aqueous solution sulfate applied to the preformed felted asbestos." (Italics quoted.)

In a second decision, upon a petition requesting reconsideration, the board declined to make any change in its former holding.

For the reason that the essence of appellants' discovery is the forming of a flexible, coherent, bibulous, felted-fiber, sheet-like body in which the asbestos fibers are interbonded *in situ* by the interaction of said fibers *in situ* as disposed in felted relation with a water-soluble inorganic compound which produces a sulphate anion in water solution, we are of the opinion that the Kennedy patent is insufficient upon which to base a rejection of the involved claims. It is clear to us that the patent does neither suggest nor instruct one skilled in the art, without the exercise of invention, to produce the articles defined in the rejected claims.

It is clear to us that the fibers of the sheets which are the product of the reference are bonded together by an organic binder which appears to be algin, derived from seaweed.

The patent was discussed in affidavits appearing in the record on behalf of appellants. It is there stated that the Kennedy process had been practiced and as a result of such operation, regardless of the substance used to precipitate the algin in the beater into a felted fiber which contained the asbestos fibers and the residual seaweed cellulose, there was no inorganic binder whatever in the resulting paper product. It was also shown that the process of the patent cannot produce a sulphate bond because the algin must first be dissolved and then precipitated while the

asbestos fibers are in suspension in the beater and that regardless of the amount of sulphate used in the aqueous suspension before felting, there is only an organic bond in the Kennedy product which is provided by the algin from the seaweed. It further appears that several tests were made of the Kennedy process, all of which resulted in a product possessing no inorganic bond whatsoever, even though sulphuric acid was used.

The results of those tests appear to us to be in accord with the statement in the involved application that the interaction between the water-soluble inorganic compound, which produces in water solution a sulphate anion, and the felted sheet-like body of the asbestos fibers "is not definitely understood, but appears to be specific between the substance of the asbestos formed mineral fibers and water-soluble inorganic compounds forming a sulphate anion in water solution.

It is not questioned here that the claims are in accord with the application.

While none of the involved claims are similar to those which have been suggested by the Board of Appeals, in our opinion, the essence of appellants' discovery is contained in all of them. Each sets out that the asbestos fibers are interbonded *in situ* by the interaction of such fibers *in situ* as they are disposed in felted relation with a water-soluble inorganic compound which produces the sulphate anion.

In view of the record herein, we cannot believe that the presence of a sulphate in the paper of the patent will inherently act as a binder for the mineral fibers. It is shown in the affidavits that the sulphates, when mixed together in a beater with the other ingredients in the making of asbestos paper, have no binding effect whatsoever.

It seems obvious that if appellants had acquiesced in the suggestion made by the Board of Appeals and filed claims in accordance with such suggestion, they would not be sufficiently protected. Anyone seeking to profit by the benefits of appellants' patentable discovery without infringement could do so merely by adding thereto quantities of any organic material.

Heretofore, this court has held that if true generic claims were found allowable, the Markush type of claims in the same application should be rejected. In re Thompson, 154 F.2d 189, 33 C.C.P.A., Patents, 942. In a notice by the Commissioner of Patents appearing in the Patent Office Official Gazette of October 11, 1949, the examiners of the Patent Office were instructed that they should not reject a Markush type claim merely because of the presence of a true genus claim which included the former in its scope. Such instruction, in our opinion, is based upon sound reasoning which appears in the following language of the notice:

"This restriction [with respect to Markush type claims] would be logically sound if there were a reasonable certainty that the true genus claim would be held valid by the courts. Conceivably, a patentee may have presented a number of examples which, in the Examiner's opinion, are sufficiently representative to support a generic claim and yet a court may subsequently hold the claim invalid on the ground of undue breadth. Where this happens the patentee is often limited to species claims which may not provide him with suitable protection.

"The allowance of a Markush type claim under a true genus claim would appear to be beneficial to the applicant without imposing any undue burden on the Patent Office or in any way detracting from the rights of the public. Such a subgenus claim would enable the applicant to claim all the disclosed operative embodiments and afford him an intermediate level of protection in the event the true genus claims should be subsequently held invalid. It would appear that this extension of the Markush practice would be in keeping with the spirit of assistance to the inventor which motivated the establishment of this practice."

The present application was prosecuted, finally decided in the Patent Office, and appealed to this court prior to the date of the said notice and, therefore, the decision of the board with respect to the rejection of claim 15, because it is of the Markush type, should be affirmed. In re Langsner, 139 F.2d 512, 31 C.C.P.A., Pat-

ents, 785. However, because the decision of the Board of Appeals will be reversed with respect to the application of the prior art and the case will again be within the jurisdiction of the Patent Office for further action, it seems reasonable to us that the rejection of claim 15, as being of the Markush type, should be withdrawn.

It seems to us that the practice inaugurated by reason of the notice and since then constantly in effect should be applied to all cases not finally determined.

For the reasons hereinbefore set out, the decision of the Board of Appeals in rejecting the involved claims as unpatentable over the prior art, is reversed, and with respect to claim 15, as being of the Markush type, its decision must be affirmed.

Modified.

O'CONNELL, Judge (dissenting in part).

The court in the prevailing opinion has set forth and taken judicial notice of the new rule of the Patent Office by which claim 15 would be allowed if now presented there. The majority, however, have affirmed the decision of the Board of Appeals with respect to the rejection of that claim.

The ground stated for the affirmance is that the court is without jurisdiction to consider the change in the law effected by the new rule of practice in the Patent Office authorizing the allowance of the claim. The majority bases its position on the ground that the change in law had occurred after the appeal was taken and no reasons of appeal are directed to that point and the point in issue, citing In re Langsner, 139 F.2d 512, 31 C.C.P.A., Patents, 785.

The question of law thus presented was raised and rejected when the Court of Customs and Patent Appeals promulgated the rule that we will here apply the appropriate law to the facts in a given case on appeal, even though in so doing *it is necessary for the court to pass upon questions not considered by the tribunals of the Patent Office and not raised by the reasons of appeal.* The Coschocton Glove Company v. Buckeye Glove Company, 90 F.2d 660, 664, 24 C.C.P.A., Patents, 1338, 1343. (Italics supplied.)

The rule in Langsner, supra, is not pertinent here because in that case the situation was based upon a subsequent change in essential facts and not a subsequent change in law effected by a change in the rules of practice in the Patent Office. When, as here, the new rule is not inconsistent with the statutes, it has force and operation of law. In re Terres et al., 150 F.2d 711, 32 C.C.P.A., Patents, 965.

By a short cut to justice, the court should relieve appellants of the necessity of resorting to all the technical apparatus of procedure, with which litigants are familiar, in order to correct a situation which the court has learned from its own records that the foundation of the decision of the Board of Appeals has been reversed. Reed v. Allen, 286 U.S. 191, 207, 52 S.Ct. 532, 76 L.Ed. 1054.